**ORIGINAL**

FILED

Charles M Sevilla, Attorney at Law CA SBN 45930
NAME

1010 Second Avenue, Suite 1825
PRISON IDENTIFICATION/BOOKING NO.

San Diego, CA 92101    (619) 232-2222
ADDRESS OR PLACE OF CONFINEMENT

Fee Paid

2011 NOV 17  AM 10: 27

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

Note: It is your responsibility to notify the Clerk of Court in writing of any change of address. If represented by an attorney, provide his name, address, telephone and facsimile numbers, and e-mail address.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

STEPHEN ROBERT DECK

FULL NAME (Include name under which you were convicted)

Petitioner,

v.

(530)

Mack Jenkins, Chief Probation Officer
SAN DIEGO COUNTY PROBATION DEPARTMENT

NAME OF WARDEN, SUPERINTENDENT, JAILOR OR AUTHORIZED
PERSON HAVING CUSTODY OF PETITIONER

Respondent.

CASE NUMBER:

**SACV11-01767 JHN (FFM)**

To be supplied by the Clerk of the United States District Court

☐ _____ AMENDED

**PETITION FOR WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY
28 U.S.C. § 2254**

PLACE/COUNTY OF CONVICTION Orange County, CA
PREVIOUSLY FILED, RELATED CASES IN THIS DISTRICT COURT
(List by case number)
CV _____
CV _____

## INSTRUCTIONS - PLEASE READ CAREFULLY

1. To use this form, you must be a person who either is currently serving a sentence under a judgment against you in a California state court, or will be serving a sentence in the future under a judgment against you in a California state court. You are asking for relief from the conviction and/or the sentence. This form is your petition for relief.

2. In this petition, you may challenge the judgment entered by only one California state court. If you want to challenge the judgment entered by a different California state court, you must file a separate petition.

3. Make sure the form is typed or neatly handwritten. You must tell the truth and sign the form. If you make a false statement of a material fact, you may be prosecuted for perjury.

4. Answer all the questions. You do not need to cite case law, but you do need to state the federal legal theory and operative facts in support of each ground. You may submit additional pages if necessary. If you do not fill out the form properly, you will be asked to submit additional or correct information. If you want to submit a legal brief or arguments, you may attach a separate memorandum.

5. You must include in this petition all the grounds for relief from the conviction and/or sentence that you challenge. And you must state the facts that support each ground. If you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

6. You must pay a fee of $5.00. If the fee is paid, your petition will be filed. If you cannot afford the fee, you may ask to proceed in forma pauperis (as a poor person). To do that, you must fill out and sign the declaration of the last two pages of the form. Also, you must have an authorized officer at the penal institution complete the certificate as to the amount of money and securities on deposit to your credit in any account at the institution. If your prison account exceeds $25.00, you must pay the filing fee.

7. When you have completed the form, send the original and two copies to the following address:
   Clerk of the United States District Court for the Central District of California
   United States Courthouse
   ATTN: Intake/Docket Section
   312 North Spring Street
   Los Angeles, California 90012

LODGED
CLERK, U.S. DISTRICT COURT

NOV 16 2011

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

PLEASE COMPLETE THE FOLLOWING: (*Check appropriate number*)

This petition concerns:
1.  ☑ a conviction and/or sentence.
2.  ☐ prison discipline.
3.  ☐ a parole problem.
4.  ☐ other.

## PETITION

1.  Venue
    a.  Place of detention <u>On supervised probation to San Diego Probation Dept. (transferred from Orange County Probation)</u>
    b.  Place of conviction and sentence <u>ORANGE COUNTY SUPERIOR COURT</u>

2.  Conviction on which the petition is based *(a separate petition must be filed for each conviction being attacked)*.
    a.  Nature of offenses involved *(include all counts)*: <u>ONE COUNT OF ATTEMPTED LEWD CONDUCT WITH A CHILD UNDER 14.</u>

    b.  Penal or other code section or sections: <u>CA. PENAL CODE 288(a)</u>

    c.  Case number: <u>06HF0372</u>
    d.  Date of conviction: <u>December 22, 2009 (verdict)</u>
    e.  Date of sentence: <u>March 19, 2010</u>
    f.  Length of sentence on each count: <u>supervised probation conditioned on 365 days local confinement. After serving the custody, probation supervision was transferred from Orange to San Diego County where petitioner lives.</u>
    g.  Plea *(check one)*:
        ☑ Not guilty
        ☐ Guilty
        ☐ Nolo contendere
    h.  Kind of trial *(check one)*:
        ☑ Jury
        ☐ Judge only

3.  Did you appeal to the California Court of Appeal from the judgment of conviction?   ☑ Yes  ☐ No
    If so, give the following information for your appeal *(and attach a copy of the Court of Appeal decision if available)*:
    a.  Case number: <u>G043434</u>
    b.  Grounds raised *(list each)*:
        (1)  <u>insufficiency of evidence</u>
        (2)  <u>prosecution misconduct in misstating elements of offense uncorrected by court despite objection and jury question</u>

    (3)  alternative argument to number 2: ineffective assistance of counsel

    (4)  illegal search and seizure

    (5)  _____

    (6)  _____

c.  Date of decision: May 24, 2011

d.  Result  Affirmed

4.  If you did appeal, did you also file a Petition for Review with the California Supreme Court of the Court of Appeal decision?  ☑ Yes  ☐ No

If so give the following information *(and attach copies of the Petition for Review and the Supreme Court ruling if available)*:

a.  Case number: S 194226

b.  Grounds raised *(list each)*:

    (1)  insufficiency of evidence

    (2)  prosecution misconduct in misstating elements of offense uncorrected by court despite objection and jury question

    (3)  _____

    (4)  _____

    (5)  _____

    (6)  _____

c.  Date of decision: August 31, 2011

d.  Result  petition for review denied

5.  If you did not appeal:

a.  State your reasons _____

b.  Did you seek permission to file a late appeal?  ☐ Yes  ☐ No

6.  Have you previously filed any habeas petitions in any state court with respect to this judgment of conviction?

☐ Yes  ☑ No

If so, give the following information for each such petition *(use additional pages if necessary, and attach copies of the petitions and the rulings on the petitions if available)*:

a.  (1) Name of court: _____

    (2) Case number: _____

    (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

(4) Grounds raised *(list each)*:

    (a) _____

    (b) _____

    (c) _____

    (d) _____

    (e) _____

    (f) _____

(5) Date of decision: _____

(6) Result _____

_____

(7) Was an evidentiary hearing held?   ☐ Yes  ☐ No


b.  (1) Name of court: _____

    (2) Case number: _____

    (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

    (4) Grounds raised *(list each)*:

        (a) _____

        (b) _____

        (c) _____

        (d) _____

        (e) _____

        (f) _____

    (5) Date of decision: _____

    (6) Result _____

_____

    (7) Was an evidentiary hearing held?   ☐ Yes  ☐ No


c.  (1) Name of court: _____

    (2) Case number: _____

    (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

    (4) Grounds raised *(list each)*:

        (a) _____

        (b) _____

        (c) _____

        (d) _____

        (e) _____

        (f) _____

(5) Date of decision: _____

(6) Result _____

_____

(7) Was an evidentiary hearing held?        ☐ Yes ☐ No

7. For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than five grounds. Summarize briefly the <u>facts</u> supporting each ground. For example, if you are claiming ineffective assistance of counsel, you must state facts specifically setting forth what your attorney did or failed to do.

**CAUTION:**    *Exhaustion Requirement*: In order to proceed in federal court, you must ordinarily first exhaust your state court remedies with respect to each ground on which you are requesting relief from the federal court. This means that, prior to seeking relief from the federal court, you first must present <u>all</u> of your grounds to the California Supreme Court.

a.  Ground one: <u>Petitioner's imprisonment is illegal and in contravention of rights guaranteed by 14th Amendment</u>

<u>due process in that through prosecution misconduct in argument his jury convicted while misdirected on the elements.</u>

(1) Supporting FACTS: <u>The California Court of Appeal agreed with petitioner that the prosecutor in his rebuttal</u>

<u>argument to the jury stated the law so as to "negate[] the essential element necessary to constitute an attempt."</u>

<u>The Court of Appeal found the error harmless, but failed to reasonably assess the error in the face of evidence</u>

<u>that the jury, during its first day of deliberations, asked the court if the prosecutor's misstatement of the law was</u>

<u>correct. The trial court erroneously believed it was correct and gave the jury no curative instruction.</u>

(2) Did you raise this claim on direct appeal to the California Court of Appeal?        ☑ Yes        ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?        ☑ Yes        ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?        ☐ Yes        ☑ No

b.  Ground two: _____

_____

(1) Supporting FACTS: _____

_____

_____

_____

_____

(2) Did you raise this claim on direct appeal to the California Court of Appeal?        ☐ Yes        ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?        ☐ Yes        ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?        ☐ Yes        ☐ No

c.  Ground three: _____

_____

(1) Supporting FACTS: _____

_____

_____

_____

_____

(2) Did you raise this claim on direct appeal to the California Court of Appeal?    ☐ Yes    ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?    ☐ Yes    ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?    ☐ Yes    ☐ No

d.  Ground four: _____

_____

(1) Supporting FACTS: _____

_____

_____

_____

_____

(2) Did you raise this claim on direct appeal to the California Court of Appeal?    ☐ Yes    ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?    ☐ Yes    ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?    ☐ Yes    ☐ No

e.  Ground five: _____

_____

(1) Supporting FACTS: _____

_____

_____

_____

_____

(2) Did you raise this claim on direct appeal to the California Court of Appeal?    ☐ Yes    ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?    ☐ Yes    ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?    ☐ Yes    ☐ No

8.  If any of the grounds listed in paragraph 7 were not previously presented to the California Supreme Court, state briefly which grounds were not presented, and give your reasons: _____

_____

_____

9.  Have you previously filed any habeas petitions in any federal court with respect to this judgment of conviction?

☐ Yes  ☑ No

If so, give the following information for each such petition *(use additional pages if necessary, and attach copies of the petitions and the rulings on the petitions if available)*:

a.  (1) Name of court: _____

(2) Case number: _____

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

(4) Grounds raised *(list each)*:

(a) _____

(b) _____

(c) _____

(d) _____

(e) _____

(f) _____

(5) Date of decision: _____

(6) Result _____

_____

(7) Was an evidentiary hearing held?      ☐ Yes ☐ No

b.  (1) Name of court: _____

(2) Case number: _____

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

(4) Grounds raised *(list each)*:

(a) _____

(b) _____

(c) _____

(d) _____

(e) _____

(f) _____

(5) Date of decision: _____

(6) Result _____

_____

(7) Was an evidentiary hearing held?      ☐ Yes ☐ No

10.  Do you have any petitions now pending (i.e., filed but not yet decided) in any state or federal court with respect to this judgment of conviction?      ☐ Yes  ☑ No

If so, give the following information *(and attach a copy of the petition if available)*:

(1) Name of court: _____

(2) Case number: _____

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

(4) Grounds raised *(list each)*:

    (a) _____

    (b) _____

    (c) _____

    (d) _____

    (e) _____

    (f) _____

11. Are you presently represented by counsel?    ☑ Yes  ☐ No

    If so, provide name, address and telephone number: Charles M Sevilla, 1010 Second Ave., Suite 1825, San Diego CA
92101; phone 619 232 2222.

WHEREFORE, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding,

_____
*Signature of Attorney (if any)*

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on _____
    *Date*
                                                      *Signature of Petitioner*

STEPHEN ROBERT DECK

_____
*Petitioner*

ORANGE COUNTY PROBATION DEPARTMENT

_____
*Respondent(s)*

**ELECTION REGARDING
CONSENT TO PROCEED BEFORE
A UNITED STATES MAGISTRATE JUDGE**

- A magistrate judge is available under 28 U.S.C. § 636 ( c) to conduct all proceedings in this case, including dispositive matters, and entry of final judgment. However, a magistrate judge may be assigned to rule on dispositive matters only if all parties voluntarily consent.

- Parties are free to withhold consent to magistrate judge jurisdiction without adverse substantive consequences.

- If both parties consent to have a magistrate judge decide the case, any appeal would be made directly to the Ninth Circuit Court of Appeals, as if a district judge had decided the matter.

- Unless both parties consent to have a magistrate judge decide the case, the assigned magistrate judge will continue to decide only non-dispositive matters, and will issue a Report and Recommendation to the district judge as to all dispositive matters.

*Please check the "yes" or "no" box regarding your decision to consent to a United States Magistrate Judge, and sign below.*

☐ Yes, I voluntarily consent to have a United States Magistrate Judge conduct all further proceedings in this case, decide all dispositive and non-dispositive matters, and order the entry of final judgment.

☑ No, I do not consent to have a United States Magistrate Judge conduct all further proceedings in this case.

Executed on ___Nov. 14, 2011___          _____
                     *Date*                                    *Signature of Petitioner/Counsel for Petitioner*

Filed 5/24/11  P. v. Deck CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G043434 |
| v. | (Super. Ct. No. 06HF0372) |
| STEPHEN ROBERT DECK, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, M. Marc Kelly, Judge.  Affirmed.

Charles M. Sevilla for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Meagan J. Beale and Heather F. Crawford, Deputy Attorneys General, for Plaintiff and Respondent.

\*              \*              \*



A jury convicted defendant Stephen Robert Deck of attempted lewd or lascivious acts involving a child under the age of 14 years. (Pen. Code, §§ 664, 288, subd. (a); all statutory references are to the Penal Code unless otherwise noted.) Deck asserts the trial court erred in denying his motion to suppress evidence of the condoms and other items police located in his car. He also challenges the sufficiency of the evidence to support the jury's conclusion he intended to commit a lewd act with the victim he met, rather than merely arrange a later rendezvous with her. Finally, he argues the prosecutor committed misconduct by misstating the law of attempt during closing argument. We conclude none of these contentions require reversal of the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

Perverted Justice is a nonprofit corporation that uses trained volunteers to act as child decoys while participating in online conversations with adults who seek to arrange sexual liaisons with minors. Once an adult contacts a decoy online and attempts to arrange a meeting with the fictitious minor, Perverted Justice provides law enforcement its computer logs or transcripts of the online conversations for further investigation.

In February 2006, the Laguna Beach Police Department worked with Perverted Justice volunteers on a sting operation to identify and arrest adults using the Internet to meet minors for sex. The operation followed a set protocol. After online conversations confirmed the adult's intent, the decoys arranged a meeting between the adult and fictitious minor at an apartment in Laguna Beach. Perverted Justice volunteers arranged at least one phone conversation before meeting the adult to confirm the adult's identity. Police officers would then arrest the adult when he arrived at the apartment.

Carolyn Graham, a Perverted Justice volunteer, acted as a decoy for the sting operation. She created online profiles on Yahoo! and MySpace for a fictitious 13-year-old girl named "Amy." In creating the profiles, Graham used an actual

2

13-year-old girl's photograph taken from a database of preapproved minors. She used the Yahoo! screen name "Ima_beangirl2."

Deck, a lieutenant with the California Highway Patrol, created an online profile describing himself as a 46-year-old male who was "single and looking." He used the screen name "South_Calif_46M" to contact "Ima_beangirl2" in a Yahoo! chat room. Deck sent Graham a message saying, "Hi, Bean. Older for younger here." When Graham responded, the two proceeded to chat online for over an hour.

During this initial conversation, Graham confirmed Deck realized her age by asking, "You know, I am 13?" Deck responded, "Yeah," and explained he reviewed "Amy's" Yahoo! and MySpace profiles. The two exchanged their first names and Deck sent Graham a photo of himself. He asked if she liked "older guys" and described himself as "available and looking." When Graham asked what he was looking for, Deck replied, "Dating. And You?"

Deck explained dating would be "kinda hard though with the age difference" because he thought Graham's "mom would [not] like it much." After Graham said, "We won't tell her," Deck replied, "Perfect. When are we going out?" He suggested they could meet after school and get some ice cream or go for a walk on the beach. Deck also asked Graham about her mother's work schedule. Graham told him her mother worked every other weekend and Deck replied, "Perfect."

Graham asked for Deck's phone number to call him, but he expressed concern because "it's long distance and will show up on mom's bill." Instead, Deck suggested they meet the next weekend, explaining he would "love to date you." Deck proposed meeting in a public place so Graham would feel more comfortable, but Graham expressed concern someone might see them together in public. Deck suggested she tell anyone who saw them together he was her father or a visiting uncle. He volunteered he "just like[d] that daughter-daddy thing."

3

Throughout the conversation, Deck repeatedly referred to Graham as "hot" or a "hottie," and that he thought she looked "sexy" and "a little slutty" in her online profile picture. Deck also told Graham he "loved [her] makeup" and thought she had "beautiful lips." They ended this initial conversation by exchanging virtual "hugs and kisses."

Following their initial conversation, Deck and Graham chatted online during five of the next six days. Deck asked Graham if they could meet one day after school for a walk on the beach. He explained he enjoyed taking pictures and would like to take some pictures of "Amy." Deck also asked if he could meet her during the upcoming weekend. When Graham replied Saturday would be good because her mother worked all day, Deck responded, "Great. . . . We will have time to do pretty much whatever we want." He asked if "Amy" would wear her makeup for him and told her, "I love it. You're so sexy." Graham informed Deck they would be alone and Deck suggested it would be "romantic and intimate" if she let him put on her makeup.

During these conversations, Deck repeatedly referred to "holding each other, passionate kisses, touching and caressing one another . . . ." He confessed to Graham he would "love to hold you and kiss you." When Graham replied "that is what [boyfriends] and [girlfriends] do," Deck interjected, "[m]mm, yessss [¶] . . . [¶] [a]ll that and more sometimes." Deck also discussed performing oral sex on "Amy," promising it would make her feel "so good." He inquired about "Amy's" experience with guys and when she said she "did oral once," Deck asked her how she "like[d] sucking cock?" He claimed "everything is better if you have the kind of chemistry we have."

Deck confirmed their planned meeting for the upcoming Saturday. Graham, however, worried about her mother finding out if they met in public and asked Deck if he would come to her apartment instead. Deck responded, "I am not comfortable meeting at your house," explaining he would rather first meet in public so they both would feel safe. Deck cautioned Graham about inviting men she met on the Internet to

4

her home and expressed gratitude that Graham felt so comfortable with him. Deck also suggested that after their first date, if their chemistry remained as good as it seemed during their chats, they would arrange another date and engage in some of the sexual activity they discussed online. Deck, however, conceded, "I probably won't be able to keep my hands off of you."

On the day of their planned meeting, Deck and Graham chatted online several times. He told her he had a sore throat and might be unable to meet that day, but said, "I still love you." He asked for "Amy's" address so he could "check it out on Map Quest." Graham gave him the address of the apartment used for the sting operation. Deck said he wanted to come over even though he did not feel well, but suggested meeting in public.

Later in the day, the two conversed online again. Deck stated he did not feel any better, and asked if Graham's mother would be around the next day. Graham replied, "Yeah." Deck professed he really wanted to see "Amy," but did not feel well. Nonetheless, he promised to stop by her apartment for their first meeting because he did not want to wait another two weeks until Amy's mother worked again on the weekend. Deck promised he would bring Graham a piece of pie when they met. He provided Graham a phone number and suggested she call him collect so the number would not appear on her mother's phone bill. Another Perverted Justice volunteer with a younger sounding voice phoned Deck. He told the caller the drive from his house would take about an hour and asked "Amy" to meet him in front of her apartment complex. Deck explained he would "hate to walk into an apartment where I don't know — really know who's there" and he wanted to "make sure if it's real and you're there . . . ."

After the phone call, Deck and Graham resumed their chat online. He explained he still felt ill and asked to postpone their meeting until one day after school. When Graham explained she could not meet after school because she carpooled with another student, Deck asked to meet her in a public place close to her apartment. They

5

finally agreed on a small park across the street from "Amy's" apartment complex. Before signing off his computer, Deck added, "Remember I am sick so no kissing or nothing.  Just bringing you your pie."  He stressed they would "hang out" and, if they liked each other, they would go out as "boyfriend and girlfriend" on another weekend when he felt better.  Deck stated they would just "talk a little bit and see what's on TV."

Deck made the 45 mile drive from his residence to "Amy's" apartment, arriving around 8:35 p.m.  He parked in the apartment complex's parking lot and walked to the park for his rendezvous with "Amy."  Spotting a young female sitting at a picnic table in the park, Deck approached and asked whether she was "Amy."  The female responded by asking whether he was "Steve."  When Deck acknowledged his identity, the police arrested him.

Investigators searched Deck and found a digital camera and the piece of pie he promised to bring "Amy."  They also searched Deck's car, where they found a MapQuest printout with directions to "Amy's" apartment and six packaged condoms past the listed expiration date.

The following morning investigators searched Deck's residence, seized his computer, and found partial chat logs of Deck's online conversations with Graham.  His internet browser history showed he visited a website for people interested in "daughter-daddy" relationships a few hours before he met "Amy."  Deck's computer also had full logs of November 2005 chats he had with two other young girls — Allison and Kirstin. These logs revealed Deck's online chats with these girls were similar to the chats he had with Graham.  He made references to these girls being "hot" and "sexy" and he discussed sexual acts with them.  Deck also attempted to arrange meetings with the girls.

The prosecutor charged Deck with a single count of attempted lewd or lascivious acts with a child under the age of 14.  Deck filed a pretrial motion to suppress the MapQuest printout and condoms found in his car, claiming the warrantless search violated his Fourth Amendment rights.  The trial court denied the motion.  The jury

convicted Deck of the charged offense and the trial court sentenced him to 365 days in county jail and five years formal probation.  Deck timely appealed.

II

DISCUSSION

A.    *The Trial Court Properly Denied Deck's Motion to Suppress Evidence*

Deck contends the trial court erred in denying his motion to suppress the MapQuest printout and the condoms investigators found while searching his car. According to Deck, no basis existed for searching his car without a warrant and the trial court should have suppressed this evidence.

"'The standard of appellate review of a trial court's ruling on a motion to suppress is well established.  We defer to the trial court's factual findings, express or implied, where supported by substantial evidence.  In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. [Citations.]' [Citation.]" (*People v. Weaver* (2001) 26 Cal.4th 876, 924.)

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures" by police officers and other government officials. (U.S. Const., 4th Amend.) "'[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the *Fourth Amendment* — subject only to a few specifically established and well-delineated exceptions.' [Citation.]" (*Arizona v. Gant* (2009) 556 U.S. ___ [129 S.Ct. 1710, 1716], italics added (*Gant*).) Two exceptions to the warrant requirement are (1) searches incident to a lawful arrest (the incident to arrest exception) and (2) searches when probable cause exists to believe the vehicle contains evidence of criminal activity (the automobile exception). (*Id.* at p. 1721.)

7

In *Gant*, the United States Supreme Court recently clarified when police may conduct a warrantless search incident to an arrest. The court explained police officers may search a vehicle incident to a recent occupant's arrest only when (1) "the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search" or (2) "it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.' [Citation.]" (*Gant, supra*, 129 S.Ct. at p. 1719.)

Here, the parties agree the facts do not support *Gant's* first justification for a warrantless search incident to arrest. Police arrested Deck in the park approximately 150 yards from his car and searched his car only after placing Deck in custody. Thus, Deck could not reach into his car at the time police searched it.

The parties, however, disagree regarding whether the facts support *Gant's* second justification for a warrantless search incident to arrest. Deck contends investigators had no reasonable basis to believe they would find in his vehicle evidence relevant to his arrest for attempted lewd act, but Deck provides no analysis to support that conclusion.

"The *Gant* court specifically requires only a 'reasonable basis to believe' the vehicle contains relevant evidence, a standard less than full probable cause. [Citation.]" (*People v. Osborne* (2009) 175 Cal.App.4th 1052, 1065 (*Osborne*).) *Osborne* illustrates how to apply this lesser standard: "Given the crime for which the officer had probable cause to arrest (illegal possession of a firearm), it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.' [Citation.] Unlike simple traffic violations,[fn. omitted] which the court in *Gant* specifically noted may provide no reasonable basis for believing the vehicle contains relevant evidence, illegal possession of a firearm is more akin to possession of illegal drugs, which would provide such a reasonable belief. [Citation.] Although the firearm found on defendant was loaded, it was reasonable to believe that the vehicle might contain additional items related to the crime of gun possession such as more ammunition or a holster. Thus we

8

find that the search of the passenger compartment was reasonable under the Fourth Amendment." (*Id.* at p. 1065.)

Police arrested Deck for attempting to commit a lewd act on a child after he engaged in a week of lengthy and sexually explicit online chats describing how he found "Amy" sexy and could not wait to kiss and touch her. Deck's arrest occurred after he drove an hour at night to meet "Amy," even though he did not feel well, explaining he did not want to wait another two weeks before the next opportunity to meet her. Deck arrived at the scheduled meeting with a camera and a piece of pie. During his online chats with Graham, Deck expressed his desire to photograph "Amy," and he made several sexual comments about pie, using it as an allusion to performing oral sex on her.

The available information provided police with reasonable grounds to believe they might find evidence relating to Deck's crime in his car. Indeed, just as the police in *Osborne* reasonably believed the defendant's car might contain ammunition, a holster, or other evidence relating to the defendant's illegal gun possession, police here reasonably believed Deck might have placed relevant evidence in his car, including explicit photos or videos he intended to show "Amy," items he intended to use in committing lewd acts with her, such as the condoms found in his car, or evidence of similar offenses he may have committed. We therefore conclude the record sufficiently established a reasonable basis for the police to search Deck's car.

Nonetheless, Deck contends no reasonable basis existed for that belief because when arrested, he held all the items he told Graham he would bring to the meeting — a piece of pie and a camera. Deck, however, fails to explain how his comments to Graham limited what investigators reasonably suspected they might find in his car. His comments to Graham do not change our conclusion police officers acted reasonably.

Alternatively, Deck argues *Gant* does not apply because it "is limited to the context of a vehicle stop." Deck reasons the incident to arrest exception did not apply

9

here because officers did not stop Deck in his car, instead arresting him 150 yards from his car.

Deck, however, fails to cite any authority supporting his proposed limitation on the incident to arrest exception. Regardless, we need not resolve this issue because Deck ignores the fact the trial court specifically found probable cause — not just a reasonable basis — supported the search of his car. Although Deck argued his suppression motion turned on *Gant's* incident to arrest exception, the trial court concluded the automobile exception to the Fourth Amendment's search warrant requirement applied: "I think to me the issue focuses on whether or not the police have probable cause to believe the car contained contraband or the evidence of a crime. And so I believe they would be entitled to search the automobile, and I think case law supports that and the facts in this case in my eyes that come forward support it."

The automobile exception is a separate exception to the Fourth Amendment's search warrant requirement. As *Gant* explains: "If there is probable cause to believe a vehicle contains evidence of criminal activity, *United States v. Ross*, 456 U.S. 798, 820-821 (1982), authorizes a search of any area of the vehicle in which the evidence might be found. . . . *Ross* allows searches for evidence relevant to offenses other than the offense of arrest, and the scope of the search authorized is broader" than the search authorized by the incident to arrest exception. (*Gant, supra*, 129 S.Ct. at p. 1721; see also *People v. Carrillo* (1995) 37 Cal.App.4th 1662, 1667, quoting *United States v. Ross* (1982) 456 U.S. 798, 809 ["Under the automobile exception to the Fourth Amendment's warrant requirement, a 'search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not actually been obtained'"]; *Chambers v. Maroney* (1970) 399 U.S. 42, 51 ["the opportunity to search is fleeting since a car is readily movable" and therefore a car may be searched without a warrant if probable cause to search the car existed].)

10

Thus, even if the incident to arrest exception did not apply here, the automobile exception provided an independent basis justifying the search of Deck's car if probable cause existed to believe the car contained evidence of criminal activity. Deck argues probable cause to search his car did not exist, but he again provides no analysis to support that conclusion. We conclude the facts described above adequately established probable cause to search Deck's car for evidence of criminal activity. (See *Illinois v. Gates* (1983) 462 U.S. 213, 238 [probable cause to search exists when "there is a fair probability that contraband or evidence of a crime will be found in a particular place"].) The trial court therefore did not err in denying Deck's motion to suppress.

B.    *Sufficient Evidence Supported Deck's Conviction*

Deck contends the evidence failed to establish he attempted to commit a lewd or lascivious act on a child under 14 years of age. We do not find the contention persuasive.

"'A reviewing court faced with . . . a claim [of insufficient evidence] determines "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citations.] We examine the record to determine "whether it shows evidence that is reasonable, credible and of solid value from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] Further, "the appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citation.] This standard applies whether direct or circumstantial evidence is involved. "Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] "'If the circumstances reasonably justify the trier of fact's

11

findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.""' [Citation.]' [Citation.]" (*People v. Crabtree* (2009) 169 Cal.App.4th 1293, 1321-1322 (*Crabtree*).)

"An attempt to commit a lewd act upon a child requires both an intent to arouse, appeal to, or gratify 'the lust, passions, or sexual desires of [the defendant] or the child' [citations] 'and . . . a direct if possibly ineffectual step toward that goal — in other words, he attempted to violate section 288.' [Citation.]" (*Crabtree, supra,* 169 Cal.App.4th at p. 1322.)

"For an attempt, the overt act must go beyond mere preparation and show that the [defendant] is putting his or her plan into action; it need not be the last proximate or ultimate step toward commission of the crime or crimes [citation], nor need it satisfy any element of the crime [citation]. However, as we have explained, '[b]etween preparation for the attempt and the attempt itself, there is a wide difference. The preparation consists in devising or arranging the means or measures necessary for the commission of the offense; the attempt is the direct movement toward the commission after the preparations are made.' [Citations.] '"[I]t is sufficient if it is the first or some subsequent act directed towards that end after the preparations are made."' [Citation.]" (*People v. Superior Court (Decker)* (2007) 41 Cal.4th 1, 8 (*Decker*).) "No clear marker divides acts that are merely preparatory from those initiating the criminal act. Nonetheless, 'the more clearly the intent to commit the offense is shown . . . "the more likely that steps in the early stages of the commission of the crime will satisfy the overt act requirement"' of an attempt. [Citation.]" (*Crabtree, supra,* 169 Cal.App.4th at p. 1322.) In other words, "'[w]henever the design of a person to commit crime is clearly shown, slight acts in furtherance of the design will constitute an attempt.'" (*Decker, supra,* at p. 8.)

12

The *Crabtree* decision applied these principles to affirm a conviction for an attempted lewd act on a child also involving an online sting operation. The defendant in *Crabtree* contacted a police officer posing online as "Hope," a 13-year-old runaway living in Sacramento. (*Crabtree, supra*, 169 Cal.App.4th at p. 1306.) The two engaged in numerous online chats regarding sex and planned a rendezvous to have sex in a Los Angeles hotel. The defendant sent "Hope" a bus ticket for the trip from Sacramento to Los Angeles. (*Id.* at pp. 1306-1307.) When the defendant arrived at the bus station looking for "Hope," police arrested him. (*Id.* at pp. 1307-1308.)

The appellate court in *Crabtree* rejected the defendant's argument his conduct constituted nothing more than preparatory acts: "Appellant does not contest the fact he drove to the bus station where he expected 'Hope' to appear pursuant to his devious plan. He does not challenge the fact that, upon his arrest, Viagra, condoms, a bikini, and bubble bath were discovered in his trunk. The presence of these items, which are consistent with appellant's sexually charged online chats with 'Hope,' and the fact he had bought the bikini shortly before his anticipated meeting with 'Hope,' strongly show appellant's intent to carry out his intended lewd act upon 'Hope.' Nothing more was necessary. [¶] We find unpersuasive appellant's position there was no attempt, because 'the events at the bus station were still in the preparation stage.' Specifically, he obviously 'was not going to have sex with Hope in the depot' but rather 'would have had to have taken her to a hotel,' and no prearrangements had been made for a hotel room or for someone else 'to pick up his son, . . . in Santa Clarita.' In other words, appellant would have the law require the police to watch idly until he actually entered a hotel room with 'Hope' to carry out his clear-cut child molesting intent. The law is otherwise." (*Crabtree, supra*, 169 Cal.App.4th at pp. 1322-1323.)

A defendant commits a lewd or lascivious act on a child when he or she engages in "'any touching' of an underage child . . . with the intent to sexually arouse either the defendant or the child." (*People v. Martinez* (1995) 11 Cal.4th 434, 442

13

(*Martinez*).) "'[T]he purpose of the perpetrator in touching the child is the controlling factor and each case is to be examined in the light of the intent with which the act was done. . . . If [the] intent of the act, *although it may have the outward appearance of innocence*, is to arouse . . . the lust, the passion or the sexual desire of the perpetrator [or the child,] it stands condemned by the statute . . . .' [Citation.] [¶] Conviction under the statute has never depended upon contact with the bare skin or 'private parts' of the defendant or the victim. [Citations.] Stated differently, a lewd or lascivious act can occur through the victim's clothing and can involve 'any part' of the victim's body. [Citations.]" (*Martinez*, at p. 444, original italics.) The "touching need not be 'sexual in character.'"[1] (*Id.* at p. 444 quoting *People v. Nothnagel* (1960) 187 Cal.App.2d 219, 225.)

With these standards in mind, we conclude ample evidence existed to support the jury's finding Deck attempted to commit a lewd act with "Amy." Deck specifically sought out "Amy" online because of her age and made contact with her by stating, "Older for younger here." When Graham specifically asked if Deck realized she was 13, he responded affirmatively and asked if she was "into older guys." In the days before their meeting, Deck's online conversations with Graham discussed "dating" "Amy," and hugging, kissing, and engaging in other sexual acts "boyfriends and girlfriends" do. These conversations became sexually explicit when Deck described performing oral sex on "Amy" and asked about her sexual experiences. Deck admitted to "Amy" that he would be unable to keep his hands off her when they met. During these conversations, Deck used eating pie as an allusion to performing oral sex on "Amy" and discussed photographing her. He repeatedly tried to arrange a meeting with "Amy" and drove an hour after dark, and while ill, to meet her because he could not wait any longer. They rendezvoused in a dimly lit park, with Deck bringing a camera and a piece of pie.

---

[1]    The trial court properly instructed the jury regarding these standards for committing a lewd or lascivious act on a child.

14

Investigators found condoms in his car and, in searching Deck's computer, found sexually explicit conversations with other underage girls that he attempted to meet.

Deck disputes none of these facts, but argues the evidence failed to show his conduct went beyond mere preparation or that he intended to commit a lewd act with "Amy" when they met. He points to the fact he repeatedly told Graham the first meeting would be in a public place and they merely would talk and get to know each other. Deck stresses he did not feel well when they met and specifically told Graham "no kissing or nothing" would occur. According to Deck, these statements made his conduct too ambiguous or equivocal to constitute an overt act and showed he had no intent to commit any lewd act during the initial meeting.

These arguments, however, ignore the jury's role in assessing the credibility of Deck's statements. A rational juror reasonably could conclude Deck's comments regarding his first meeting with "Amy" served merely as a ploy to convince "Amy" to meet him or as a prudent precaution Deck took to verify "Amy's" age and identity. In evaluating the sufficiency of the evidence, we are mindful that "'it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which [the judgment] depends.'" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) "'On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] . . .'" (*Ibid.*)

Deck attaches significance to the fact he insisted "Amy" meet him in a public place, but that fact does not compel the conclusion the evidence failed to support the judgment. An overt act beyond mere preparation may occur in public or private, and may appear as "'innocent behavior.'" (*People v. Reed* (1996) 53 Cal.App.4th 389, 398 (*Reed*), quoting *People v. Dillon* (1983) 34 Cal.3d 441, 455.) In *Crabtree*, the police arrested the defendant when he sought to meet the "child" in a public place — a bus

15

station — after having sexually explicit online conversations. (*Crabtree*, *supra*, 169 Cal.App.4th at p. 1323.) The *Crabtree* court affirmed the conviction and nothing compels a different result here.

Moreover, as discussed above, the underlying crime of committing a lewd act on a minor may be based on conduct having "*the outward appearance of innocence*." (*Martinez*, *supra*, 11 Cal.4th at p. 444, original italics.) The "'controlling factor'" is the defendant's intent when touching the minor, not the type of touching. (*Ibid.*) An apparently innocent hug or other touching in public is sufficient if done with the required intent to sexually arouse the defendant or the child. Here, the jury need only have found Deck intended to touch "Amy" with the intent to arouse himself or her and sufficient evidence existed to support that finding.

The fact Deck and "Amy" met in public also does not mean Deck intended they would remain in public. Deck merely insisted they meet in a public place; he said nothing about staying in a public place. In fact, during his conversations with Graham on the day they met, Deck discussed possibly going back to "Amy's" apartment to watch television or a movie. The prosecution presented evidence suggesting Deck proposed meeting in public to confirm "Amy's" identity as a 13-year-old girl, not to prevent any lewd conduct during the initial meeting. Indeed, Deck explained he wanted to meet in public because he would "hate to walk into an apartment where I don't know — really know who's there" and he needed to "make sure if it's real and you're there. . . ."

Finally, Deck attempts to distinguish several cases that affirmed convictions for attempted lewd acts on minors. (*Crabtree*, *supra*, 169 Cal.App.4th 1293; *People v. Herman* (2002) 97 Cal.App.4th 1369; *Hatch v. Superior Court* (2000) 80 Cal.App.4th 170; *People v. Ansaldo* (1998) 60 Cal.App.4th 1190; and *Reed*, *supra*, 53 Cal.App.4th 389.) He argues the evidence here is "markedly deficient," when compared to the evidence found sufficient in these other cases because he told "Amy" nothing sexual would happen during their initial meeting. This argument, however, is

16